IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Juan Bautista Beltran-Lopez, et al,<br><br>Defendants. | No. CR 08-0800-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendant Juan Bautista Beltran-Lopez's Motion To Suppress Statements and Evidence (Dkt. # 44) and Defendant Jose Portillo-Lopez's Joinder in the Motion to Suppress (Dkt. # 45).

**1. Facts**

At the hearing on the motion, the government offered one witness: DEA Agent Matt Buchert. Agent Buchert testified as to his own knowledge, and he provided hearsay testimony about the knowledge of other DEA agents involved in the investigation. On a motion to suppress, the Court has the discretion to accept and evaluate hearsay testimony. Federal Rules of Evidence, Rules 104(a) and 1101(d)(i); *United States v. Matlock,* 415 U.S. 164, 174 (1974). The Court accepts the testimony only for the purposes specified below.

Agent Buchert testified that a narcotics arrest in Holbrook, Arizona involved the Arizona DEA office in an ongoing investigation with DEA offices in Columbia and New York City, and that ultimately led to the arrests and the charges in this case.

In September 2007, four Hispanic individuals were arrested in Holbrook, Arizona. They were driving an Avis rental car from the area of San Luis, Arizona to Denver and then on to New York City. Each of the individuals was wearing hiking shoes or boots that had sole inserts containing heroin. The identification cards of the individuals, admitted into evidence, established that the transporters of heroin came from the San Luis, Mexico region and that, between them, they were carrying almost $1900 in cash. An analysis of the cell phones of these suspects indicated that they had contact with telephone numbers used by persons affiliated with a Columbian drug-trafficking organization ("DTO"). The Arizona DEA office thus made contact with the Columbian DEA office and a New York DEA field office to coordinate further investigation.

In late October, the Columbian DEA office received authorization to run more than thirty different wiretaps on the operations of the Columbian DTO. In early November, DEA agents in Arizona received information from the DEA agent in charge of the Columbian investigation that they had three telephone intercepts from the DTO that related to Arizona. The three intercepts all apparently occurred on the same day, November 6, 2007, and were between the same individuals who were believed to be DTO operatives. In the first conversation, the participants discussed shipping what the agents interpreted to be heroin to "Jonda" for shipment to New York City. The participants in the intercepted conversation disclosed "Jonda's" contact phone number as a specific number with an area code assigned to telephones in southwest Arizona. The second and third calls also apparently contained details about what the agents interpreted to be one or more deliveries of heroin. One of the deliveries was referred to as four "pairs." The persons referred to in the calls included "Jonda," "the doctor," "the Dominican" and "the lady."

Two days later, Agent Buchert applied for an authorization from the United States Magistrate Judge to put a ping trace on the phone number identified in the first conversation

so that the DEA could track the whereabouts of the cell phone. In the affidavit submitted to the Magistrate Judge for the ping trace, Agent Buchert incorrectly stated that the phone with the relevant number had actually been used by participants in intercepted conversations, rather than correctly stating that the cell phone number had been identified in an intercepted conversation of members of the DTO as belonging to "Jonda." And that, further, the DEA believed, by virtue of the intercepted conversations, that "Jonda" was involved in the receipt and transportation of heroin shipments. Authorization for the ping trace was obtained from the Magistrate Judge. Defendants make no argument that, on the correct facts, the Magistrate Judge would have lacked probable cause to issue the authorization, and the Court finds that sufficient probable cause in fact existed to authorize the ping trace based on the correct facts.

On November 30, a second shipment of heroin being transported in sole inserts in boots was seized in Holbrook, Arizona and Gallup, New Mexico. The three individuals seized were all on the same bus. They were all going to New York City. One of them had entered through the San Luis port of entry, and they were all wearing oversized boots that were fitted with molded inserts containing heroin. Although the first two bus passengers were arrested in Holbrook, the third was not arrested until the two who were seized in Holbrook indicated that another delivery agent was still on the bus. The third heroin transporter was subsequently seized in Gallup, New Mexico. Later intercepts on the Columbian wiretap lines confirmed that the heroin lost in this arrest belonged to the Columbian DTO.

On the same date that these arrests occurred, November 30, 2007, DEA agents in Arizona were informed by DEA agents in Bogota, that they had intercepted a conversation that they interpreted as meaning that "Jonda" would be receiving another shipment of heroin.

The location of the phone identified with "Jonda" had been randomly checked since the DEA received the ping trace authorization on November 8. On December 3, the ping coordinates of "Jonda's" contact phone indicated that the holder of the cell phone was in San Luis, Mexico. On December 4, the coordinates indicated that the holder of the cell phone had crossed into the United States but was still in San Luis, Arizona. On December 5, the

first ping of the day put the cell phone west of Denver. The second ping placed the cell phone at the Denver airport.

Toll records obtained on the phone indicated that the cell phone had been used to place a phone call to the Avis car rental agency at the Denver airport. The DEA agents in Arizona contacted the New York City DEA field office to inform them of the approach of a vehicle containing the cell phone indicated as the one belonging to Jonda, who apparently coordinated heroin deliveries for the Columbian DTO. DEA agents contacted the Avis car rental agency at the Denver airport in an attempt to obtain a description of the vehicle rented by persons who might be carrying the cell phone, but agents were unable to successfully identify the vehicle.

The DEA agents continued to get ping coordinates on the eastbound cell phone. The eleven pings taken on December 6 showed that the cell phone was in a vehicle that was taking a direct route from Denver to New York City on I-70 and then I-78. The DEA agents from the Arizona and New York field offices remained in the coordinated investigation. The New York City office began highway surveillance along the interstate in an attempt to identify the particular Avis rental car carrying the cell phone by coordinating pings on the cell phone with their highway observations. The results of this coordination led them to identify and undertake mobile surveillance on a 2007 white Chrysler minivan with California plates that was registered to Avis. The New York DEA undertook mobile surveillance on the vehicle. The van stopped at Jersey City to get gasoline. Both Defendants exited the vehicle. Portillo-Lopez was the driver and Beltran-Lopez was on the passenger side. When they resumed travel, Portillo-Lopez remained the driver. The vehicle continued to New York City.

As the van passed through the Holland Tunnel, the DEA agents following the vehicle in mobile surveillance, watched it pass through an EZ pass lane without authorization, thus without paying the required toll. The detection system registered Portillo-Lopez's failure to pay the toll.

A final ping test conducted on the vehicle that was Eastbound on 6th Avenue in Manhattan indicated that the cell phone shared the same coordinates as the van on which the DEA was conducting mobile surveillance. The van turned on 46th Street then made another turn to access 45th Street and stopped mid-block letting Beltran-Lopez out of the vehicle. It then went back to a Comfort Inn on 46th Street between 6th Avenue and Broadway.

Portillo-Lopez went to the lobby, leaving the two women passengers in the van. The DEA agents approached the women left in the van, identified themselves as law enforcement officers, and stated, as a ruse, that they had a report that the occupants of the van had been brandishing a firearm. Magda Rosa Inzuza-Sanchez, one of the occupants of the vehicle, had a pronounced emotional response–screaming and crying.

Portillo-Lopez returned, identified himself as a doctor from Mexico, and permitted a search of his luggage. The search of Portillo-Lopez's luggage revealed no contraband. The suspects at the minivan were shortly thereafter placed in handcuffs and questioned, although the sequence of these latter two actions is unclear.

Meanwhile, Beltran-Lopez, after exiting the van, stood on 45th Street in the cold for five or six minutes looking up and down the street as if he expected to contact someone. He made a call on his cell phone and then began walking back in the direction of the Comfort Inn. The agents followed him. The agents noted that Beltran-Lopez had an odd gait, but did not take any special notice that he had on boots, and at this time, made no connection with the Holbrook arrests. Beltran-Lopez looked over his shoulder several times at the agents. When the agents stopped him, he reached for his left front pocket. Agents seized his hand, did a pat-down search, and felt something hard in his left pocket. Beltran-Lopez consented to the removal of the object, which proved to be a cell phone. Beltran-Lopez informed the agents that the number of the cell phone was the number identified in the intercepted call as belonging to the phone on which "Jonda" could be contacted. The agents then accompanied Beltran-Lopez back to the hotel where the other suspects were being questioned by agents.

At some point the suspects were placed into handcuffs and individually questioned. After it was determined that a narcotics canine could not be quickly brought to the scene, the

1 DEA made the decision to return the Defendants to the DEA office. At this point, the
2 government concedes, the suspects were under arrest. The Court finds, however, that the
3 Defendants were placed under arrest as soon as they were placed in handcuffs. Because it
4 is not clear whether the Defendants were individually questioned before or after they were
5 placed in handcuffs, and whether the Defendants were handcuffed before or immediately
6 after they were taken into the lobby, the Court will not consider their responses to
7 questioning at the Comfort Inn, in determining whether there was probable cause to arrest
8 the Defendants on narcotics charges.

**2. Probable Cause**

The fundamental question on this motion to suppress the heroin located in the Defendants' boots and the resulting confession is whether there was probable cause to arrest the two Defendants for narcotics-based offenses at the time of their arrest.

**Beltran-Lopez**

The United States acknowledges that Portillo-Lopez's traffic violation would not provide a reasonable basis for arresting and searching Beltran-Lopez. It argues, nevertheless, that probable cause existed to arrest Beltran-Lopez for a narcotics stop after agents conducted a permissible protective frisk of Beltran-Lopez, and, thereafter, discovered the cell phone associated with Jonda.

The probable cause question is answered by determining "whether, at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the . . . decision." *Illinois v. Gates*, 462 U.S. 213 (1983); "[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006).

Further, because this was a coordinated police investigation, the "collective knowledge" doctrine applies. *United States v. Ramirez,* 473 F.3d 1026, 1031-32 (9th Cir. 2007). Under that doctrine, in making a probable cause determination, courts "look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually undertakes" the arrest. *Id.* In this circuit, the knowledge of the other officers can be attributed to the officer conducting the arrest or search so long as "there has been communication among the [various] agents" even if the salient facts giving rise to probable cause are not communicated to the agents conducting the search and the ensuing arrest. *Id.* Further, even if the collective knowledge doctrine did not apply "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States,* 517 U.S. 806, 813 (1996) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)); *see also Brigham City v. Stuart,* 547 U.S. 398, 404 (2006) (same).

In this case, DEA agents in Columbia, Arizona, and New York were involved in the investigation of a Columbian DTO and specifically its distribution network through Arizona to New York City. In connection with that ongoing investigation, the officers coordinated their efforts and spoke frequently. Immediately prior to the Defendants' arrest on December 7, 2007, the agents' collective knowledge was:

    1.    A Columbian DTO was engaged in some heroin shipments to New York City.

    2.    The DTO used a delivery route that ran from San Luis, Mexico to New York City through Denver, Colorado.

    3.    The DTO had a history of transporting the cocaine in molded sole inserts that were placed in boots or hiking boots of the persons they used to transport the cocaine.

    4.    In September 2007, a delivery along this route had been attempted by four Hispanic individuals from the San Luis, Mexico area driving an Avis rental car. The delivery

1. agents, who were arrested in Holbrook, Arizona, all had heroin concealed in sole inserts in their boots.

5. A similar delivery along this route had been attempted by three Hispanic individuals from the San Luis, Mexico area on November 30. All of the heroin transporters were bus passengers headed for New York City.

6. Intercepted telephone traffic obtained through the Columbian wiretaps indicated that the heroin taken on the November 30 arrests was the property of the Columbian DTO, and the DTO had been informed that the heroin had been seized in the course of the attempted delivery.

7. Earlier intercepted telephone conversations on November 6, 2007, between two associates of the Columbian DTO mentioned the Arizona cell phone number belonging to "Jonda," an associate of the DTO who was involved in, what the DEA agents interpreted to be, heroin deliveries into the United States. During that phone call the DTO operatives identified a cell phone number on which "Jonda" could be reached. That cell phone number was a number issued to telephones in southern Arizona.

8. Two other intercepted telephone conversations occurring on November 6, between the same individuals again mentioned "Jonda" as the recipient of the DTO's heroin for delivery.

9. One of those conversations referred to the heroin as being delivered in four "pairs."

10. On November 30, 2007, the DEA agents monitoring the Columbian DTO intercepted and reported to the Arizona DEA agents a communication that indicated that "Jonda" would be receiving a shipment of three to five kilograms of heroin for delivery.

11. The Arizona DEA had been randomly tracking the location of "Jonda's" cell phone since early November when it had received a warrant authorizing it to "ping" trace the location of the cell phone.

12. Three days after they obtained the intercept indicating that "Jonda" would be receiving a shipment of three to five kilograms of heroin, "Jonda's" cell phone entered the United States.

13. The next day, on December 4, the cell phone was on the outskirts of Denver and was used to call an Avis rental car facility at the Denver airport. Over the next two days the cell phone proceeded on a direct route to New York City, along the interstate highway system.

14. Prior to reaching New York City, the agents identified that the vehicle that Beltran-Lopez was traveling in contained "Jonda's" cell phone.

15. After passing a Comfort Inn, the vehicle dropped Beltran-Lopez off at mid-block on 45th Street and then returned to the Comfort Inn.

16. After looking up and down the street for several minutes, Beltran-Lopez walked back towards the Comfort Inn.

17. Defendant had an odd and unnatural gait.

18. When Beltran-Lopez was stopped by agents he put his hand to his left pocket. Agents stopped him and conducted a protective frisk. They felt something hard in Defendant's left pocket. They were given permission by Beltran-Lopez to extract the cell phone, which Defendant then identified as having the number that they believed belonged to "Jonda." Shortly, thereafter, Beltran-Lopez was returned to the Comfort Inn and arrested.

"The standard for justifying a frisk is whether a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger." *United States v. Thomas,* 863 F.2d 622, 628 (9th Cir. 1988) (citing *Terry v. Ohio,* 392 U.S. 1, 27 (1968)). Under the facts of this case, DEA agents had probable cause to arrest Defendant when they stopped him. Thus, when he moved toward his left pocket, they were justified in frisking him, and removing the cell phone.

At the time the DEA made the arrest in this case, the collective DEA agents involved in the investigation and tracking of the Defendants were entitled to reasonably rely on the fact that "Jonda's" phone had a connection to the Columbian DTO and its heroin distribution

network. They knew that the information identifying "Jonda's" phone number had been obtained by wiretap interception which had identified it as a number connected with heroin distribution. They knew that information obtained over the intercepted lines from Columbia DTO members had, in the past, related to attempts by that DTO into the United States that had been foiled. They knew that a similar interception had indicated a week earlier that "Jonda" had received an additional shipment of heroin. They knew that within three days after that interception "Jonda's" cell phone, which DEA had been randomly monitoring, entered into the United States and started on the same delivery route that had been previously used by the Columbian DTO. They knew that Defendants were following similar patterns used by others who had attempted heroin deliveries on behalf of the Columbian DTO. They knew that "Jonda's" cell phone was used to rent an Avis van at the Denver airport, and were thereafter able to locate "Jonda's" cell phone in the van as it traveled directly to New York. They knew that this delivery route was similar to the delivery route previously twice attempted by the Columbian DTO and knew that, in both of those instances, the heroin had been concealed in sole inserts in the shoes of the transporters. They also knew that the heroin seized in both cases had been traced back to the Columbian DTO.

When the agents on the scene observed that the Defendant was walking unnaturally, and that he was the carrier of the cell phone, the agents, accumulating their collective knowledge, added to the probable cause to arrest him for a narcotics offense.

Defendants argue that the agents themselves did not believe that they had probable cause, or they would not have contemplated requesting a drug detection canine at the scene of the arrest. While a positive identification by a drug detection dog would have increased the probable cause for the arrest, which was not overwhelming here, the absence of such evidence does not mean that the agents lacked probable cause, especially in light of the collective knowledge of all of the agents involved in the investigation.

Nor does the failure of any of the individual agents making the arrest to make a connection to the arrests in northern Arizona prevent probable cause from attaching here. Both the collective knowledge doctrine, and the doctrine that "probable cause" is objectively

- 10 -

measured, mean that the perception of the agents who actually executed the arrest is not controlling. "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States,* 517 U.S. 806, 813 (1996) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)). And, "probable cause means 'fair probability,' not certainty or even a preponderance of the evidence." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006).

Measured against these standards, probable cause to arrest Beltran-Lopez on drug-related charges existed. Therefore Defendant's Motion to Suppress as to him is denied.

**Portillo-Lopez.**

Much of the same evidence that establishes probable cause for the arrest of Beltran-Lopez also applies with respect to Portillo-Lopez. He was in the same van as the cell phone that was identified as being used by an agent of the Columbian DTO who had recently received a delivery of heroin for transportation. And Portillo-Lopez, as a known driver of the van, followed the same route, rented a van from Avis, traveled with four Hispanic companions from San Luis and used many of the same methods as other heroin transporters for the DTO. Further, on the agents' contact with the passengers of Portillo-Lopez's van, Inzuza-Sanchez had an extremely emotional and volatile response to the contact with law enforcement agents.

When Portillo-Lopez emerged from the lobby, he further identified himself as a "doctor." On intercepted calls between Columbian DTO members discussing "Jonda" they had used the nickname "the doctor" to describe one of the associates of "Jonda" who was also affiliated with the Columbian DTO. And, the frisk of Beltran-Lopez, which occurred prior to Portillo-Lopez's arrest revealed that Beltran-Lopez had "Jonda's" phone. After that point, as before stated, the Court finds that Portillo-Lopez was placed under arrest, so it does not use the responses to the individual questioning to determine whether there was probable cause to arrest Portillo-Lopez.

Nevertheless, the Court finds that the above facts provide sufficient probable cause to arrest Portillo-Lopez on drug-related charges. Even if they do not, there was sufficient probable cause to arrest Portillo-Lopez because, in the plain view of the agents who were conducting mobile surveillance on the van, Portillo-Lopez passed through the Holland Tunnel without paying the toll. It is a criminal offense in the state of New York to do so. N.Y. Unconsol. Laws §§ 6802, 6810, 6816. In the suppression hearing, Portillo-Lopez did not challenge that assertion.

New York law authorizes DEA agents to make arrests for any crime committed in their presence. N.Y. Crim. Proc. Law §§ 1.20(34-a)(a), 2.15(5), 2.20(a), 140.25(1)(a), 140.25(b)(1). Further, law enforcement officers may incarcerate an individual for any crime, including minor traffic crimes, that are only punishable by a fine. *Atwater v. City of Lago Vista,* 532 U.S. 318, 323 (2001). That the agent's motivation for stopping and arresting Portillo-Lopez was not his traffic violation does not render the resulting search unreasonable. An agent's "state of mind . . . is irrelevant to the existence of probable cause. . . . That is to say, [his or her] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004).

There was, therefore, sufficient probable cause to arrest Portillo-Lopez both on drug offenses and criminal traffic charges. Even had the arrest been made on criminal traffic charges, the heroin in the molded shoe inserts would have been inevitably discovered as a result of an inventory search incident to arrest. As a result, neither the heroin located in his sole inserts, nor his confession rendered thereafter is suppressed. Further, neither Defendant makes any argument that he has the standing to suppress the heroin found on, or the statements made by, the other passengers of the van. Therefore,

**IT IS HEREBY ORDERED** denying Defendant Beltran-Lopez's Motion To Suppress (Dkt. # 44) and Defendant Portillo-Lopez's Joinder (Dkt. # 45) in that motion.

DATED this 21st day of October, 2009.

_____
G. Murray Snow
United States District Judge